No. 08-2677

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————————

UNITED STATES OF AMERICA,

PETITIONER,

v.

CAROL ANNE BOND,

RESPONDENT.

———————————

## On Appeal from the United States District Court
## for the Eastern District of Pennsylvania
## Criminal Case No. 07-528

———————————

## DEFENDANT-APPELLANT'S OPENING
## SUPPLEMENTAL BRIEF

———————————

Ashley C. Parrish
Adam M. Conrad
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC  20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
aparrish@kslaw.com
aconrad@kslaw.com

Paul D. Clement
*Counsel of Record*
Conor B. Dugan
BANCROFT PLLC
1919 M Street, NW, Suite 470
Washington, DC  20036
Telephone: (202) 234-0090
Facsimile: (202) 234-2806
pclement@bancroftpllc.com
cdugan@bancroftpllc.com

Robert E. Goldman
ROBERT E. GOLDMAN LLC
P. O. Box 239
Fountainville, PA 18923
Telephone: (215) 348-2605
Facsimile: (215) 348-8046
reg@bobgoldmanlaw.com

Dated: September 16, 2011

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF ISSUES ...................................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS .............2

STATEMENT OF THE CASE AND FACTS .......................................2

      A.     The Convention and Implementing Legislation....................4

      B.     The Procedural History .........................................................8

SUMMARY OF ARGUMENT .............................................................13

STANDARD OF REVIEW ...................................................................16

ARGUMENT .........................................................................................16

I.     To Avoid Serious Constitutional Concerns, 18 U.S.C. § 229 Should Be Interpreted Not To Apply To Ms. Bond's Conduct. ..................16

      A.     Applying 18 U.S.C. § 229 To This Case Raises Grave Constitutional Concerns. ...................................................17

      B.     This Case Is Not Controlled By *Missouri v. Holland*.........................21

            1.     *Missouri v. Holland* Did Not Obliterate The Constitutional Limits On Congress's Authority To Implement Treaties. ...............................................21

            2.     This Case Is Readily Distinguished From *Missouri v. Holland*.................................................................25

      C.     The Court Should Interpret 18 U.S.C. § 229 Consistent With Federalism Principles And To Avoid Grave Constitutional Concerns. ...................................................32

            1.     Multiple Canons of Construction Counsel Against the Government's Sweeping View of 18 U.S.C. § 229.................33

      2.    18 U.S.C. § 229 Can Be Construed To Avoid Constitutional Doubt and To Respect The Traditional Federal-State Balance. ...........................................................38

II.    If 18 U.S.C. § 229 Cannot Be Construed Away From Constitutional Doubt, It Is Unconstitutional Because It Is Not Necessary And Proper To Carry Out The Executive's Treaty Power. ....................................................................................................47

III.    There Are Strong Policy Reasons Not To Accept The Government's Expansive And Novel Theory. ..............................................51

CONCLUSION ..................................................................................................55

CERTIFICTE OF LENGTH, FORMAT, AND ADMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Arizonans for Official English v. Arizona*,
    520 U.S. 43 (1997) ............................................................33

*Asakura v. City of Seattle*,
    265 U.S. 332 (1924) .................................................. 17, 19

*Ashwander v. Tenn. Valley Auth.*,
    297 U.S. 288 (1936) ........................................................34

*BFP v. Resolution Trust Corp.*,
    511 U.S. 531 (1994) ........................................................34

*Bond v. United States*,
    131 S. Ct. 2355 (2011) ............................................... *passim*

*Boos v. Barry*,
    485 U.S. 312 (1988) ........................................................18

*Burton v. United States*,
    196 U.S. 283 (1905) ........................................................33

*Comm'r v. Brown*,
    380 U.S. 563 (1965) ........................................................36

*De Geofroy v. Riggs*,
    133 U.S. 258 (1890) ........................................................17

*De Leon-Reynoso v. Ashcroft*,
    293 F.3d 633 (3d Cir. 2002) ............................................16

*Dolan v. U.S. Postal Serv.*,
    546 U.S. 481 (2006) ........................................................41

*Dunn v. United States*,
    442 U.S. 100 (1979) ........................................................36

*Edward J. DeBartolo Corp. v.
    Fla. Gulf Coast Bldg. & Const. Trades Council*,
    485 U.S 568 (1988) ........................................................33

*Ex parte Siebold*,
    100 U.S. 371 (1880) ........................................................................12

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .........................................................................34

*Fowler v. United States*,
    131 S. Ct. 2045 (2011) .....................................................................36

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) .........................................................................34

*Gov't of Virgin Is. v. Knight*,
    989 F.2d 619 (3d Cir. 1993) .............................................................36

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ........................................................... 24, 25, 34

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982) .........................................................................35

*Heydenfeldt v. Daney Gold & Silver Mining Co.*,
    93 U.S. 634 (1877) ...................................................................35, 40

*Holden v. Joy*,
    84 U.S. 211 (1873) ...........................................................................19

*Igartua–De La Rosa v. United States*,
    417 F.3d 145 (1st Cir. 2005) ............................................................31

*In re Kaiser Aluminum Corp.*,
    456 F.3d 328 (3d Cir. 2006) .............................................................36

*Jones v. United States*,
    529 U.S. 848 (2000) .................................................................. *passim*

*Mayor of New Orleans v. United States*,
    35 U.S. 662 (1836) .............................................................. 18, 19, 22

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) .............................................................. 20, 47

*McNeill v. United States*,
   131 S. Ct. 2218 (2011) ........................................................................35

*Medellin v. Texas*,
   552 U.S. 491 (2008) ........................................................... 28, 31, 49

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ........................................................................34

*Missouri v. Holland*,
   252 U.S. 416 (1920) .................................................................. *passim*

*Montana v. Egelhoff*,
   518 U.S. 37 (1996) ....................................................................... 27, 51

*Moore v. Balkcom*,
   716 F.2d 1511 (11th Cir. 1983)...................................................... 27, 37

*New York v. United States*,
   505 U.S. 144 (1992) ..................................................................... 18, 25

*Office Comm'r. Baseball v. Markell*,
   579 F.3d 293 (3d Cir. 2009) ...............................................................35

*Plaster v. United States*,
   720 F.2d 340 (4th Cir. 1983)..............................................................20

*Power Auth. v. FPC*,
   247 F.2d 538 (D.C. Cir. 1957),
   *vacated as moot sub nom.*
   *Am. Pub. Power Ass'n v. Power Auth. of State of N.Y.*,
   355 U.S. 64 (1957) ...........................................................................19

*Prigg v. Pennsylvania*,
   41 U.S. (16 Pet.) 539 (1842) ..............................................................32

*Printz v. United States*,
   521 U.S. 898 (1997) ..................................................................... 24, 47

*Reid v. Covert*,
   354 U.S. 1 (1957) .............................................................................18

*Renne v. Geary*,
    501 U.S. 312 (1991) .......................................................................26

*Rewis v. United States*,
    401 U.S. 808 (1971) .......................................................................35

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) .......................................................................40

*Skilling v. United States*,
    130 S. Ct. 2896 (2010) ..................................................................36

*Stewart v. Kahn*,
    78 U.S. (11 Wall.) 493 (1871)........................................................43

*Tennessee Electric Power Co. v. Tennessee Valley Authority*,
    306 U.S. 118 (1939) .......................................................................10

*United States v Lue*,
    134 F.3d 79 (2d Cir. 1998) ............................................................23

*United States v. Bass*,
    404 U.S. 336 (1971) ............................................................ *passim*

*United States v. Bond*,
    581 F.3d 128 (3d Cir. 2009) ................................................ *passim*

*United States v. Comstock*,
    130 S. Ct. 1949 (2010) ..................................................................48

*United States v. Enmons*,
    410 U.S. 396 (1973) .......................................................................35

*United States v. Ferreira*,
    275 F.3d 1020 (11th Cir. 2001)......................................................23

*United States v. Hodge*,
    321 F.3d 429 (3d Cir. 2003) ..........................................................35

*United States v. Lanier*,
    520 U.S. 259 (1997) .......................................................................36

*United States v. Lara,*
    541 U.S. 193 (2004) ...................................................................................22

*United States v. Li,*
    206 F.3d 56 (1st Cir. 2000) ......................................................................23

*United States v. Lopez,*
    514 U.S. 549 (1995) ........................................................................ 18, 24

*United States v. McRary,*
    665 F.2d 674 (5th Cir. 1982) ....................................................................43

*United States v. Morrison,*
    529 U.S. 598 (2000) ...................................................................................24

*United States v. Rodia,*
    194 F.3d 465 (3d Cir. 1999) .....................................................................37

*United States v. Salerno,*
    481 U.S. 739 (1987) ...................................................................................26

*United States v. Universal C.I.T. Credit Corp.,*
    344 U.S. 218 (1952) ...................................................................................36

*United States v. Whitted,*
    541 F.3d 480 (3d Cir. 2008) .....................................................................34

*Williams v. United States,*
    458 U.S. 279 (1982) ...................................................................................46

## Rules, Statutes, & Regulations

18 Pa.C.S.A. § 2701 ..........................................................................................29

18 Pa.C.S.A. § 2702 ..........................................................................................29

18 Pa.C.S.A. § 2709 ..........................................................................................29

18 U.S.C. § 111 ....................................................................................................8

18 U.S.C. § 112 ....................................................................................................8

18 U.S.C. § 113 ....................................................................................................8

18 U.S.C. § 114 ................................................................8

18 U.S.C. § 115 ................................................................8

18 U.S.C. § 175(a) ..........................................................30

18 U.S.C. § 229(a)(1) .................................................30, 48

18 U.S.C. § 229A(a)(2) ................................................8, 27

18 U.S.C. § 229F(1)(A) .......................................6, 7, 38, 39

18 U.S.C. § 229F(7) ..........................................9, 41, 42

18 U.S.C. § 229F(7)(A) ..................................7, 8, 39, 41

18 U.S.C. § 229F(8)(A) ..................................7, 27, 39

18 U.S.C. § 2332a ............................................................8

18 U.S.C. § 2332b(g)(5)(B)(i) ......................................8, 41

18 U.S.C. § 299(a)(1) .......................................................6

18 U.S.C. § 3142(f)(1)(A) ...........................................8, 41

18 U.S.C. § 3143(b)(2) ................................................8, 41

18 U.S.C. § 831 ..............................................................30

18 U.S.C. § 1951 ..............................................................8

18 U.S.C. § 2111 ..............................................................8

18 U.S.C. § 2113 ..............................................................8

18 U.S.C. § 2114.3 ............................................................8

18 U.S.C. § 2332b(g)(5) ...................................................53

18 U.S.C. § 2252(a)(4)(B) ...............................................30

1918 Migratory Bird Treaty,
    16 U.S.C. §§ 703–12 ...............................................21

Chemical Weapons Convention Implementation Act of 1998,
Pub. L. No. 105-277, 112 Stat. 2681-856
*codified at* 22 U.S.C. §§ 6701-6771 ........................................................6

Executive Order 13128,
64 Fed. Reg. 34,702 (June 28, 1999) ....................................................6

Organisation for the Prohibition of Chemical Weapons,
*Convention on the Prohibition of the Development,*
*Production, Stockpiling and Use of Chemical Weapons*
*and on their Destruction* (1993),
http://www.opcw.org/chemical-
weapons-convention/articles ..................................................... *passim*

S. Ct. R. 45 ...................................................................................12

**Other Authorities**

143 Cong. Rec. S3309-02 (daily ed. April 17, 1997) ...............................5

Bethany Lukitsch Hicks, *Treaty Congestion in International Environmental*
*Law: The Need for Greater International Coordination*,
32 U. Rich. L. Rev. 1643 (1999) ..........................................................24

Curtis A. Bradley, *The Treaty Power and American Federalism, Part II*,
99 Mich. L. Rev. 98 (2000) ................................................................24

Edmund Randolph, Remarks at the Virginia Convention (June 18, 1788), *in*
3 Elliot's Debates on the Federal Convention .......................................19

Edwin Meese, III, *Big Brother on the Beat: The Expanding Federalization of*
*Crime*,
1 Tex. Rev. L. & Pol. 1 (1997) ...........................................................52

Eileen M. Connor, *The Undermining Influence of the Federal Death Penalty*
*on Capital Policymaking and Criminal Justice Administration in the*
*States*,
100 J. Crim. L. & Criminology 149 (2010) ...........................................28

International Committee of the Red Cross,
*Fact Sheet: Chemical Weapons Convention* (2003),
*available at* http://www.icrc.org/web/eng/siteeng0.nsf/html/57JR8F)..................4

James Madison,
Remarks at the Virginia Convention (June 19, 1788) ,
*in* 3 Elliot's Debates on the Federal Convention.................................................19

John Gleeson,
*Supervising Federal Capital Punishment:*
*Why the Attorney General Should Defer when U.S. Attorneys*
*Recommend Against the Death Penalty,*
89 Va. L. Rev. 1697 (2003)..................................................................................27

John P. Cunningham,
*An Uninvited Guest:*
*The Federal Death Penalty and the*
*Massachusetts Prosecution of Nurse Kristen Gilbert,*
41 U. Rich. L. Rev. 969 (2007) ...........................................................................28

John Panneton,
*Federalizing Fires:*
*The Evolving Federal Response to Arson Related Crimes,*
23 Am. Crim. L. Rev. 151 (1985) ........................................................................52

Kathleen F. Brickey,
*Criminal Mischief: The Federalization of American Criminal Law,*
46 Hastings L.J. 1135 (1995) ...............................................................................52

Matthew H. Blumenstein,
Note, *RICO Overreach: How The Federal Government's Escalating*
*Offensive Against Gangs Has Run Afoul Of The Constitution,*
62 Vand. L. Rev. 211 (2009)................................................................................52

Nicholas Q. Rosenkranz,
*Executing the Treaty Power,*
118 Harv. L. Rev. 1867 (2005) ...................................................... 24, 32

Restatement (Third) Foreign Relations Law § 321 cmt. b. ....................................32

Shorter Oxford English Dictionary (5th ed. 2002) ..................................................42

Steven D. Clymer,
*Unequal Justice: The Federalization of Criminal Law,*
70 S. Cal. L. Rev. 643 (1997)...............................................................................52

The American Heritage College Dictionary (3d ed. 1997)......................................42

The Federalist No. 17 (Hamilton) (Clinton Rossiter ed., 1961) .............................27

Tr. of Oral Argument,
   *Bond v. United States*,
   131 S. Ct. 2355 (2011) (No. 09-1227),
   *available at* http://www.supremecourt.gov/oral_arguments/
   argument_transcripts/09-1227.pdf ......................................................................39

# STATEMENT OF JURISDICTION

The government initiated this case in the district court by filing a four-count indictment charging defendant-appellant Carol Bond with two counts of use of a chemical weapon in violation of 18 U.S.C. § 229, and two counts of theft of mail in violation of 18 U.S.C. § 1708. This Court has jurisdiction to review the judgment of conviction under 28 U.S.C. § 1291 and the final sentence under 18 U.S.C. § 3742. The United States District Court for the Eastern District of Pennsylvania had subject matter jurisdiction under 18 U.S.C. § 3231.

# STATEMENT OF ISSUES

Did the district court err in denying defendant's motion to dismiss the two counts of the indictment charging the use of chemical weapons in violation of 18 U.S.C. § 229?

This issue was raised, objected to, and ruled upon at the following specific pages of the appendix. App. 42–43 (Mot. Dismiss); App. 45–65 (Mem. in Support of Mot. Dismiss); R. 30 at 7 (Mem. Law in Opp'n to Bond Mot. Dismiss); App. 94–95 (Motions Hr'g Tr.); App. 168 (Motions Hr'g Tr.); App. 178 (Order Denying Mot. Dismiss).[1]

---

[1] "App." refers to the appendix previously filed in the original appeal before this Court. "Sen.App." refers to the appendix of sealed sentencing documents filed in the original appeal. "U.S. Br." refers to the government's brief filed with this Court on November 13, 2008. "Bond Br." refers to Ms. Bond's brief filed with the

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case was previously before the Court on appeal from the judgment of the District Court for the Eastern District of Pennsylvania. The Court issued a decision on September 17, 2009, affirming the lower court on standing grounds. *See United States v. Bond*, 581 F.3d 128 (3d Cir. 2009). That decision has since been reversed by the U.S. Supreme Court and remanded to this Court for further proceedings. *See Bond v. United States*, 131 S. Ct. 2355 (2011).

Ms. Bond is not aware of any other related case or proceeding.

## STATEMENT OF THE CASE AND FACTS

Time is of the essence here: Appellant, Carol Bond, is currently serving the last year of a six-year sentence in federal prison, and she has yet to receive an appellate ruling on the merits of her complaint that her prosecution is fundamentally flawed. Her federal sentence stems from a domestic dispute that occurred when Bond learned that her once closest friend, Myrlinda Haynes, was pregnant and that Bond's husband was the child's father. In the wake of that upsetting discovery, Bond tried to injure Haynes by placing certain toxic chemicals on Haynes's mailbox, car door handle, and other areas likely to be touched. Sen.App. 4–5 (Presentence Investigation Report ("PSR")). Her plan "succeeded" to the extent of a minor chemical burn on Haynes's thumb, which Haynes treated

---

Court on September 8, 2008. "R." refers to the district court record. The first number after "R." is the document number on the district court docket.

by rinsing with water.  Sen.App. 7 (PSR).   The two chemicals involved were potassium dichromate, which Bond purchased from a photography equipment supplier through Amazon.com, and 10-chloro-10H-phenoxarsine, which Bond obtained from her employer, a chemical manufacturer.  Sen.App. 6 (PSR); App. 329–330, 337 (Sentencing Hr'g Tr.).  The undisputed evidence establishes that Bond had no intent to kill Haynes.  Sen.App. 8 (PSR).

Domestic disputes resulting from marital infidelity and culminating in a thumb burn are appropriately handled by local law enforcement authorities.  Bond accepted full responsibility for her actions and, under state law, would likely have faced a prison sentence of at most 3 to 25 months.  Instead of allowing local law enforcement authorities to handle this local dispute, however, the United States Attorney decided to prosecute Bond on the novel theory that her conduct violated 18 U.SC. § 229, a federal statute prohibiting possession and use of "any chemical weapon."  App. 6–8 (Indictment).  Congress enacted that statute to implement the United States' treaty obligations under the 1993 Chemical Weapons Convention, formally entitled the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their Destruction ("Convention").  *See* http://www.opcw.org/chemical-weapons-convention/articles; *see also* App. 68–72 (excerpts).

## A.     The Convention and Implementing Legislation

The Chemical Weapons Convention is an international arms-control agreement among nation-states intended to address the proliferation of weapons of mass destruction and to prohibit signatory states from developing, producing, or stockpiling chemical weapons.    App. 69 (Preamble); App. 73 (International Committee of the Red Cross ("ICRC"), *Fact Sheet: Chemical Weapons Convention* (2003), *available at* http:// www.icrc.org/web/eng/siteeng0.nsf /html/57JR8F).    The Convention's objective is to move towards "complete disarmament under strict and effective international control" and the "elimination of all types of weapons of mass destruction."  App. 69 (Preamble).  As the ICRC has explained, the Convention reinforces the 1925 Geneva Protocol prohibiting chemical and biological warfare, and "belongs to the category of instruments of international law that prohibits weapons deemed particularly abhorrent."  App. 73.

Article I establishes the signatory states' obligation "never under any circumstances" to use, develop, or stockpile chemical weapons or engage in military preparations to use chemical weapons.  App. 70.  Articles III and IV establish an elaborate reporting and verification process, requiring signatory states to destroy any chemical weapon stockpiles, and establishes inspection and monitoring processes to be conducted by the Organization for the Prohibition of Chemical Weapons, an international organization that sits in The Hague,

4

Netherlands. And Article VII ensures that individuals are prohibited from engaging in activities that would violate the Convention if undertaken by signatory states. App. 71. Article VII does not, however, seek to interfere with signatory states' internal constitutional processes. Instead, it accommodates those processes by mandating that each state signatory "shall, *in accordance with its constitutional processes*, adopt the necessary measures to implement its obligations under this Convention, including "enacting penal legislation" to ensure that no "natural and legal person[] anywhere on its territory or in any other place under its jurisdiction" undertakes "any activity" prohibited to the signatory state. App. 71 (emphasis added).

Before the Convention's passage, then-Secretary of State Madeleine Albright argued that the Convention would "make it less likely that our Armed Forces will ever again encounter chemical weapons on the battlefield, less likely that rogue states will have access to the material needed to build chemical arms, and less likely that such arms will fall into the hands of terrorists." 143 Cong. Rec. S3309-02 (daily ed. April 17, 1997). The Senate ratified the Convention in late-April 1997.

Because the Convention is not self-executing, Congress subsequently passed implementing legislation providing statutory authority for domestic compliance with the Convention's provisions. *See* Chemical Weapons Convention

5

Implementation Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681-856, *codified at* 22 U.S.C. §§ 6701–6771; App. 75–76 (Executive Order 13128, 64 Fed. Reg. 34,702 (June 28, 1999)). Congress also established criminal and civil penalties for statutory violations committed within the United States or by American citizens outside the United States. *See* 18 U.S.C. §§ 229 *et seq.* The criminal provisions make it unlawful for any person "knowingly" to "develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon." *Id.* § 299(a)(1).

While those provisions largely track the language of the Convention, they go further in some respects. For example, the statute prohibits possessing or threatening to use chemical weapons, while the Convention does not. Section 229F defines "chemical weapons" as including: (1) "toxic chemical[s]" and reactants involved in their production, "except where intended for a purpose not prohibited under this chapter"; (2) "munition[s] or device[s]" designed to cause harm through toxic chemicals; and (3) "equipment" designed for use in connection with those munitions and devices. *Id.* § 229F(1)(A). "Toxic chemicals" are thus presumptively swept into the definition of "chemical weapons" unless they are intended for a non-prohibited purpose. In turn, "toxic chemicals" are defined incredibly broadly to refer to "any chemical which through its chemical action on

6

life processes can cause death, temporary incapacitation or permanent harm to humans or animals." *Id*. § 229F(8)(A).

Because of the broad sweep of the definition of "toxic chemicals" and the broad presumptive sweep of the term "chemical weapon," the key to the statute's definitional coverage is the extent of purposes "not prohibited under this chapter." *Id*. § 229F(1)(A). That phrase cuts back on the presumptive classification of every broadly defined toxic chemical as a chemical weapon. That phrase is what prevents countless household cabinets from being chock full of "chemical weapons." The statute itself recognizes that many "toxic chemicals" serve peaceful and socially beneficial purposes and are not "chemical weapons" that, under the Convention, signatory states are obligated to destroy. The statute accordingly makes clear that a toxic chemical is not "intended for purposes not prohibited" under the statute and, therefore, does not qualify as a "chemical weapon," when it is intended for "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity." *Id*. § 229F(7)(A).

The statute thus criminalizes any conduct involving a toxic chemical, including widely available chemicals with commercial uses, when used for any non-peaceful purpose. Unlike other federal statutes that address assaults, Section 229 includes no requirement that the assault occur within the special jurisdiction of

7

the United States, that the assault have an effect on interstate commerce, that the victim be a person or institution with recognized federal status, or that some other federal interest be involved. *See*, *e.g.*, 18 U.S.C. §§ 111–115, 1951, 2111, 2113, 2114.3, 2332a. The statute also includes no requirement that the government prove a federal interest as an element of the offense. *Bond*, 581 F.3d at 134. Consistent with its intent to criminalize serious activities implicating a major international treaty, the statute carries substantial penalties and unusual restrictions, such as a prohibition on release pending appeal. *See* 18 U.S.C. § 3143(b)(2); *id.* § 3142(f)(1)(A); *id.* § 2332b(g)(5)(B)(i). Indeed, the statute makes a defendant eligible for the death penalty and requires a sentence no less than life in prison for a violation of the statute where "the death of another person is the result" of the statutory violation. *Id.* § 229A(a)(2).

### B. The Procedural History

Bond's assault did not involve stockpiling chemical weapons, engaging in chemical warfare, or undertaking any of the activities prohibited to state signatories under the Convention. Nonetheless, the United States Attorney's Office prosecuted Bond under 18 U.S.C. § 229. The indictment took the position that potassium dichromate and 10-chloro-10H-phenoxarsine were "toxic chemical[s] . . . [as] defined in 18 U.S.C. § 229F(7)(A)" and "not intended by defendant Bond to be used for a peaceful purpose." App. 7–8.

8

In proceedings before the U.S. District Court for the Eastern District of Pennsylvania, Bond moved to dismiss the charges, arguing that as applied to her 18 U.S.C. § 229 exceeded Congress's enumerated powers, invaded the powers reserved to the States by the Tenth Amendment, and impermissibly criminalized conduct that lacked any nexus to any legitimate federal interest. App. 42–43, 44–65. Bond initially challenged the statute as exceeding Congress's power under the Commerce Clause and its power to implement treaties. App. 53–56 (Mem. in Support Mot. Dismiss). But the government disclaimed any reliance on the Commerce Clause, R. 30 at 7 (Mem. Law in Opp'n to Bond Mot. Dismiss), and so the dispute focused on Congress's power to implement treaties and the Tenth Amendment. The district court denied the motion from the bench. App. 168. It held that applying 18 U.S.C. § 229(a) to this local, domestic dispute did not impinge on principles of federalism because the statute "was enacted by Congress and signed by the president under the necessary and proper clause of the Constitution . . . to comply with the provisions of a treaty." App. 168. Bond entered a conditional guilty plea while reserving the issue for appeal. App. 5. The district court then sentenced Bond to 72 months in federal prison, with five years of supervised release, and ordered her to pay a $2,000 fine and restitution in an amount of $8,558,29. App. 380–386.

Bond filed a timely appeal with this Court, *see* App. 387, reiterating her constitutional objection that applying 18 U.S.C. § 229 to her case reflected a "massive and unjustifiable expansion of federal law enforcement into [a] state-regulated domain." Bond Br. 10–11. As Bond explained, Congress should not be permitted to "[u]tiliz[e] the Treaty Power to create plenary federal criminal jurisdiction over conduct that federal law enforcement could not otherwise reach." *Id*. at 18.

On September 17, 2009, this Court affirmed without resolving that constitutional objection. *See United States v. Bond*, 581 F.3d 128 (3d Cir. 2009). The Court recognized that the constitutional arguments pressed by Bond raised difficult issues of "first impression," and noted that significant debate existed over the scope of *Missouri v. Holland*, 252 U.S. 416 (1920), a case on which the government's theory heavily relies. The Court did not, however, reach the merits of Bond's constitutional challenge. Instead, after ordering supplemental briefing, the Court accepted the government's argument that Bond lacked standing under *Tennessee Electric Power Co. v. Tennessee Valley Authority*, 306 U.S. 118 (1939). *See Bond*, 581 F.3d at 135–38. Viewing *Tennessee Electric* as binding, the Court concluded that it was obliged to deny Bond standing and leave the Supreme Court the prerogative of overruling its own precedent.

Bond filed a timely petition for a writ of certiorari in the Supreme Court. The Supreme Court granted certiorari and, on June 16, 2011, reversed. *See Bond v. United States*, 131 S. Ct. 2355 (2011). Although the government had argued before this Court that Bond lacked standing, it changed course in the Supreme Court and confessed error. *See id.* at 2361. It also urged the Supreme Court to develop a new bifurcated test for Tenth Amendment standing.

The Supreme Court made clear that *Tennessee Electric* should not be viewed as an obstacle to standing and rejected the government's new bifurcated test. Instead, it held that Bond has standing to challenge her conviction because "[f]ederalism secures the freedom of the individual" in addition to preserving the sovereignty of the various States. *Id.* at 2364. Indeed, "[a]n individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable." *Id.*

The Supreme Court expressed no view on the merits of Bond's Tenth Amendment challenge, leaving it to "be addressed by" this Court "on remand." *Id.* at 2367. Justice Ginsburg nonetheless wrote separately to emphasize that if Bond succeeds on the merits of her constitutional challenge, her conviction must be reversed. As Justice Ginsburg explained, a conviction under an unconstitutional law "is not merely erroneous, but is illegal and void, and cannot be a legal cause of

11

imprisonment." *Id.* at 2367 (quoting *Ex parte Siebold*, 100 U.S. 371, 376–77 (1880)).

The Supreme Court's mandate issued on June 16, 2011, returning the case to this Court for further proceedings. *See* S. Ct. R. 45. On August 5, 2011, at the parties' request, the Court ordered supplemental briefing. Oral argument is set for November 16, 2011.

## SUMMARY OF ARGUMENT

The government's interpretation of 18 U.S.C. § 229 raises constitutional questions of the first order.  In the government's view, any malicious use of common household chemicals is a federal offense, and if a malicious assault results in death, the crime is eligible for the federal death penalty.  As this case dramatically demonstrates, it does not matter how domestic the dispute or how far removed it is from the concerns that prompted Congress to enact legislation to implement the Chemical Weapons Convention.

The government attempts to ground its defense of this sweeping view of the statute in *Missouri v. Holland*, 252 U.S. 416 (1920).  But make no mistake: the government's position would require this Court to go several large steps beyond *Holland*.  *Holland* rejected a facial challenge by applying a balancing test that weighed the State's minimal pecuniary interest in migratory birds that would not exist without international cooperation against the paramount national interest in protecting those birds through a treaty with Canada.  This case involves an as-applied challenge to a statute that cuts to the heart of state authority to penalize ordinary criminal conduct and decide whether and when to apply the death penalty. The countervailing federal interest is all but non-existent.  While Congress surely had a significant interest in implementing the Convention, it cannot seriously be

13

argued that the application of the statute to Bond is necessary to ensure our Nation's compliance with the Convention.

This Court has already recognized the significant controversy over the scope and continuing vitality of *Missouri v. Holland*. Fortunately, however, this Court need not confront those difficult questions because an interpretation of the statute exists that avoids them by making clear the statute does not properly reach Bond's conduct. That interpretation not only avoids the need to resolve nerve-center constitutional questions of great difficulty, but comports with numerous canons of statutory construction. There is no reason to interpret the statute to upset the traditional division of authority between the federal and state governments, when it can be construed to reach, not every malicious use of chemical, but only those uses that are non-peaceful in the sense of implicating war-like actions that could be undertaken by a nation-state or terrorist group. That reading comports with the Convention's direction to criminalize conduct that would violate the Convention if undertaken by a signatory state. It is also analogous to the interpretation a unanimous Supreme Court adopted in *Jones v. United States*, 529 U.S. 848 (2000), to avoid reading the federal arson statute to reach every arson in the nation. This Court should likewise read Section 229 so as to not reach every malicious use of common chemicals.

If this Court does not adopt this more sensible construction of the statute, then there is no question but that Section 229 is unconstitutional as applied to Bond. A statute that sweeps as broadly as the government's vision of Section 229 is neither necessary nor proper. It is not necessary to implement the Convention. The failure to punish Bond's conduct would not cause a breach of our Convention obligations. And even if it were necessary to punish Bond's conduct, Pennsylvania already does. There is absolutely no necessity for a parallel prohibition in federal law. Under these circumstances, the resulting deviation from our Constitution's basic division of authority is improper. Indeed, even if a duplicative federal prohibition on Bond's conduct were somehow necessary for compliance with the Convention it would still be beyond Congress's power. Congress could not pass a general murder statute, even by invoking an international covenant for the protection of life. An effort to prohibit every malicious use of widely available chemicals by pointing to a treaty fares no better.

Finally, the government's misguided interpretation of the statute trivializes true chemical weapons and represents the *non plus ultra* of the disturbing trend of over-federalizing crime. This Court should either make clear that either the statute does not reach this far or that it violates the most basic premises of "Our Federalism" because it does.

## STANDARD OF REVIEW

The district court's ruling on Bond's motion to dismiss challenging the constitutionality of 18 U.S.C. § 229 as applied to her is reviewed de novo. *See De Leon-Reynoso v. Ashcroft*, 293 F.3d 633, 635 (3d Cir. 2002).

## ARGUMENT

### I.     To Avoid Serious Constitutional Concerns, 18 U.S.C. § 229 Should Be Interpreted Not To Apply To Ms. Bond's Conduct.

This case involves a purely local domestic dispute that could have and should have been handled by local law enforcement.  There is no allegation that the assault occurred within the special jurisdiction of the United States, that the assault had any effect on interstate commerce, or that the victim had a recognized federal status.  Instead, the government has embraced a view of 18 U.S.C. § 229 that threatens to turn countless household chemicals into "chemical weapons" whenever they are used with malicious intent.  Under the government's view, every attempted poisoning — whether of a human or a neighbor's pet — and every assault using any toxic chemical, no matter how localized the dispute, is subject to federal prosecution under the heavy artillery of the Convention's implementing statute and its harsh penalties.

The government's extreme position on the scope of Section 229 depends on a constitutional theory just as sweeping.  The government has taken the stance that the treaty power "invests Congress with independent authority to pass otherwise

prohibited legislation" and that this power may be wielded to "override the powers otherwise reserved" to the States.  U.S. Br. 26, 31–32 (the Tenth Amendment is no "impediment to statutes passed pursuant to the treaty power").  The government attempts to ground its theory on an aggressive reading of *Missouri v. Holland*.  But the government overreads that readily distinguishable decision and asks this Court to go where no court has ever gone before in approving essentially plenary federal authority.  Fortunately, there is a common sense reading of Section 229 that avoids all this and makes clear that Bond should never have been ensnared by the government's expansive reading of the statute.  The statute Congress passed does not inevitably make every malicious use of a household chemical a federal offense. The Court should apply a common sense interpretation of Section 229 and avoid the grave constitutional concerns raised by the government's theory by construing the statute as having no application to this case.

## A.    Applying 18 U.S.C. § 229 To This Case Raises Grave Constitutional Concerns.

The Supreme Court has long held that the treaty power "does not extend 'so far as to authorize what the Constitution forbids.'"  *Asakura v. City of Seattle*, 265 U.S. 332, 341 (1924) (quoting *De Geofroy v. Riggs*, 133 U.S. 258, 267 (1890)).  It "would be manifestly contrary to the objectives of those who created the Constitution, as well as those who were responsible for the Bill of Rights — let alone alien to our entire constitutional history and tradition — to" permit the

17

federal government "to exercise power under an international agreement without observing constitutional prohibitions." *Reid v. Covert*, 354 U.S. 1, 17 (1957) (plurality op.); *id*. at 66 (Harlan, J., concurring in judgment); *see also Mayor of New Orleans v. United States*, 35 U.S. 662, 736 (1836). In short, "'no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." *Boos v. Barry*, 485 U.S. 312, 324 (1988) (quoting *Reid*, 354 U.S. at 16).

Contrary to the government's position, the Tenth Amendment is not just "an exercise in setting the boundary between different institutions for their own integrity." *Bond*, 131 S. Ct. at 2364 (citing *New York v. United States*, 505 U.S. 144, 181 (1992)); *cf*. U.S. Br. 30–31 (arguing that the Tenth Amendment is merely "a residual body of otherwise undisposed authority"). As the Supreme Court has clarified in this very case, the structural principles embodied in the Tenth Amendment impose affirmative constraints on the federal government. *Bond*, 131 S. Ct. at 2366. The principles of "limited national powers and state sovereignty are intertwined" and an "[i]mpermissible interference with state sovereignty is not within the enumerated powers of the National Government." *Id*.; *see also United States v. Lopez*, 514 U.S. 549, 566 (1995) ("Congress' authority is limited to those powers enumerated in the Constitution").

Accordingly, when implementing a treaty, Congress cannot ignore the Constitution's *structural* limits on federal power any more than it can ignore the *express* limits on federal power. *See* Edmund Randolph, Remarks at the Virginia Convention (June 18, 1788), *in* 3 Elliot's Debates on the Federal Convention 504 (when "the Constitution marks out the powers to be exercised by particular departments, . . . no innovation can take place" by use of the treaty power); James Madison, *supra* at 514–15 (June 19, 1788) (rejecting claim that treaty power "is absolute and unlimited"). The treaty power extends only to "proper subjects of negotiation between our government and other nations," *Asakura*, 265 U.S. at 341, and must be exercised consistently "with the nature of our government *and the relation between the States and the United States*." *Holden v. Joy*, 84 U.S. 211, 243 (1873) (emphasis added). As the Supreme Court has long held, because the "government of the United States . . . is one of limited powers," its authority cannot "be enlarged under the treaty-making power." *Mayor of New Orleans*, 35 U.S. at 736. Indeed, "[n]o court has ever said . . . that the treaty power can be exercised without limit to affect matters which are of purely domestic concern and do not pertain to our relations with other nations." *Power Auth. v. FPC*, 247 F.2d 538, 543 (D.C. Cir. 1957), *vacated as moot sub nom. Am. Pub. Power Ass'n v. Power Auth. of State of N.Y.*, 355 U.S. 64 (1957); *see also Plaster v. United States*,

720 F.2d 340, 348 (4th Cir. 1983) ("treaty obligations cannot justify otherwise unconstitutional government conduct").

The government urges the Court to brush aside this well-established precedent and embrace a rule that nothing is off-limits to the federal government as long as there is some tangential relationship to an international treaty. Given the multitude of international treaties governing a virtually unlimited range of subjects and intruding deeply on internal concerns in ways that would be unimaginable to the Framers, the government's theory is really that nothing is off-limits. *But cf. McCulloch v. Maryland*, 17 U.S. 316, 405 (1819) (our "government is acknowledged by all[] to be one of enumerated powers"). According to the government, Section 229 is properly applied to Bond's purely local conduct because the Tenth Amendment, and the structural constitutional principles it embodies, are irrelevant when Congress enacts a federal criminal statute to effectuate the terms of an international treaty. *See* U.S. Br. 26 (treaty power "invests Congress with independent authority to pass otherwise prohibited legislation"). In the government's view, there is no traditionally state-regulated conduct that remains beyond the federal government's reach (and reserved to the States) when Congress enacts a statute to implement an international treaty. That breathtaking proposition, if accepted by this Court, would radically reset the balance between the federal and state governments that underlies our system of

federalism.  In this context, the government surely faces a heavy burden to justify its attempt to revolutionize the constitutional framework.  It has not come close to satisfying that burden.

**B.    This Case Is Not Controlled By _Missouri v. Holland._**

The government's position rests principally on its contention that the radical proposition on which it relies has already been established by the Supreme Court in _Missouri v. Holland._  But that decision, which is controversial enough for what it actually held, is not nearly as sweeping as the government apparently believes. The government's position would not merely require this Court to apply _Holland_ but to extend it and go into territory where no court has previously ventured.

**1.    _Missouri v. Holland_ Did Not Obliterate The Constitutional Limits On Congress's Authority To Implement Treaties.**

In _Holland_, the Supreme Court considered a facial challenge to the constitutionality of the 1918 Migratory Bird Treaty 16 U.S.C. §§ 703–12, which implemented a treaty between the United States and Great Britain designed to protect migratory birds traveling between Canada and the United States.  252 U.S. at 430–31.  Missouri contended that the statute violated the Tenth Amendment because it interfered with the State's sovereign right to regulate the killing of migratory birds within its territory.  _Id_.  In a narrowly focused decision that balanced the state and national interests involved, the Supreme Court upheld the

statute as a necessary and proper exercise of Congress's authority to effectuate the treaty power.

In reaching its decision, the Court observed that "there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could."  *Id.* at 433; *see also United States v. Lara*, 541 U.S. 193, 201 (2004).  The government places decisive weight on this dictum.  *See* U.S. Br. 26.  But, when read in context of the opinion as a whole, that statement reflects the Court's conclusion that, when "matters requiring national action" are involved, the "body of private relations" that usually fall within a state's purview may be affected by a treaty.  *Holland*, 252 U.S. at 433–34.

Contrary to the government's position, however, *Holland* did not establish any bright-line rule suggesting that Congress's authority to enact treaty-implementing legislation is unlimited by the Tenth Amendment.  *Holland*, 252 U.S. at 433.  Nor did it break new ground by overturning the Court's earlier precedent holding that Congress's police power authority cannot "be enlarged under the treaty-making power."  *Mayor of New Orleans*, 35 U.S. at 736; *see Holland*, 252 U.S. at 435 (stating that it was applying "established rules to the present case").  Any attempt to read *Holland* as establishing such a sweeping bright-line rule is belied by the opinion as a whole.  The Court in *Holland* clearly applied a balancing test, weighing the State's pecuniary interest in regulating the

killing and sale of migratory birds, which the Court viewed as *de minimis*, against the national interest in protecting them, which the Court viewed as paramount. *See id*. at 435 ("a national interest of very nearly the first magnitude is involved"). As the Court explained, because migratory birds are only "transitorily within the State," their protection could "only" occur through "national action in concert with that of another power." *Id*. Absent such national and international intervention there would be no migratory birds for a state to assert a pecuniary interest over in the first place. And it treated the legislation and treaty as co-extensive. *See id*. The legislation thus did not violate the Tenth Amendment because it properly implemented a "valid treaty" on an issue of national (and international) concern.

As this Court previously recognized, there is a significant debate over the "scope and persuasiveness" of *Holland*. *Bond*, 581 F.3d at 135.[2] This controversy has been fueled by the proliferation of international treaties covering all manner of issues that neither the Framers nor the *Holland* Court would have viewed as proper subjects of treaties. *See*, *e.g.*, *United States v. Li*, 206 F.3d 56, 67 (1st Cir. 2000)

---

[2] Reflecting one side of this ongoing debate, the government relies on two out-of-Circuit authorities that have broadly interpreted *Holland*'s dicta. *See United States v Lue*, 134 F.3d 79, 80–81 (2d Cir. 1998); *United States v. Ferreira*, 275 F.3d 1020, 1027 (11th Cir. 2001). Both cases are also readily distinguished. The treaty at issue in those cases "addresses . . . the treatment of foreign nationals while they are on local soil, a matter of central concern among nations." *Lue*, 134 F.3d at 83; *see also Ferreira*, 275 F.3d at 1027. Neither *Lue* nor *Ferreira* purports to resolve the question here — whether the treaty power permits the federal government to intrude in purely local matters.

(stating that "in a shrinking world, the number of treaties to which the United States is a party has proliferated"); Bethany Lukitsch Hicks, *Treaty Congestion in International Environmental Law: The Need for Greater International Coordination*, 32 U. Rich. L. Rev. 1643, 1646 (1999) (recognizing "problem of treaty conflict" and "attribut[ing it] to the increasingly expanding number of international treaties").    Moreover, the decision's dicta has been called into question by modern Supreme Court precedent restoring appropriate limits on Congress's legislative authority.  *See*, *e.g.*, *Lopez*, 514 U.S. 549; *United States v. Morrison*, 529 U.S. 598 (2000).    As commentators have noted, parts of the decision are "in deep tension with the fundamental constitutional principle of enumerated legislative powers."  Nicholas Q. Rosenkranz, *Executing the Treaty Power*, 118 Harv. L. Rev. 1867, 1868 (2005); *see also* Curtis A. Bradley, *The Treaty Power and American Federalism, Part II*, 99 Mich. L. Rev. 98, 100 (2000). Indeed, in recent decades, the Supreme Court has reasserted the critical role of the Tenth Amendment in preserving the proper balance of authority between federal and state government to ensure that all levels of government represent and remain accountable to the People. *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 920–21 (1997); *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).  As the Supreme Court has emphasized, reflecting "one of the Constitution's structural protections of liberty,"

*Printz*, 521 U.S. at 921, the Tenth Amendment serves to "reduce the risk of tyranny and abuse." *Gregory*, 501 U.S. at 458; *see also New York*, 505 U.S. at 144.

The Supreme Court's painstaking efforts to revive its Tenth Amendment and enumerated powers jurisprudence, reconciling the undoubted truth that the federal government is one of limited and enumerated powers with the reality of the modern administrative state, would largely be for naught if the treaty power is as all-encompassing as the government insists. When treaties covered only discrete topics on international intercourse between nation-states, the treaty power was an unlikely source for pretensions of plenary federal power. But in an era where treaties cover nearly every exercise of government power and purport to regulate internal matters rather than only intercourse between nation-states, the threat posed by the government's reading of *Holland* to the Supreme Court's more recent efforts to impose meaningful limits on Congress is very real.

### 2.   This Case Is Readily Distinguished From *Missouri v. Holland.*

This Court need not resolve any tension between *Holland* and more recent precedents, however, because this case is not controlled by *Holland*. Indeed, there are several salient differences between the two cases.

As an initial matter, in *Holland*, Missouri raised a facial challenge to the statute in general, arguing essentially that it was void in all of its applications as "an unconstitutional interference with the rights reserved to the States by the Tenth

Amendment." 252 U.S. at 431; *see also id.* at 432 (noting that it was unnecessary "to going into any details, because . . . the question raised is the general one"); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (that a statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid"). The State's complaint was not that the federal government was improperly seeking to extend an otherwise valid treaty-implementing statute by, for instance, applying the statute to resident, sedentary birds within the State's territory that were already protected under state law. Here, in stark contrast, Bond is *not* challenging 18 U.S.C. § 229 on its face. No one disputes that Congress has authority in general to enact federal legislation to address the problem of terrorism and chemical weapons of mass destruction. Instead, Bond is raising a much more limited and narrowly focused as-applied challenge. She contends that, whatever its validity more generally, the statute cannot be constitutionally applied to her in the circumstances of this case. *See Renne v. Geary*, 501 U.S. 312, 323–24 (1991) (facial challenge should generally not be entertained when an "as-applied" challenge could resolve the case).

More fundamentally, in this case as compared to in *Holland*, the balance between the national interest and the State's interest is dramatically different on both fronts. The State's interest here is much greater because applying Section 229 to Bond's conduct marks a radical intrusion into the State's sovereign prerogative

to administer "private justice between" its citizens, The Federalist No. 17, at 118 (Hamilton) (Clinton Rossiter ed., 1961), and to determine the appropriate punishment for local crimes. *Montana v. Engelhoff*, 518 U.S. 37, 43 (1996) (plurality opinion) ("preventing and dealing with crime is . . . the business of the States") (alteration and internal quotations omitted); *cf.* 18 U.S.C. § 229A(a)(2) (mandating that any person who violates the provision and "by whose action the death of another person is the result shall be punished by death or imprisoned for life"). Cases of poisoning and the existence of substances whose "chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals," 18 U.S.C. § 229F(8)(A), were not unknown to the Framers. The notion that these offenses would be anything but a core concern for the States would have been unthinkable. And no matter what the intervening developments in federalism, the decision whether to impose the death penalty remains a core sovereign prerogative of the States. *See, e.g.*, *Moore v. Balkcom*, 716 F.2d 1511, 1517 (11th Cir. 1983) ("It is the decision of the state government as a matter of state statutory law, subject to federal constitutional constraints, to decide whether or not to provide a capital punishment mechanism and to provide for appropriate procedural safeguards."); John Gleeson, *Supervising Federal Capital Punishment: Why the Attorney General Should Defer when U.S. Attorneys Recommend Against the Death Penalty*, 89 Va. L. Rev. 1697, 1716 (2003) (in a federal system that

"rightly accords great deference to states' prerogatives, the federalization of the death penalty should be limited to cases in which there is a heightened and demonstrable federal interest"); Eileen M. Connor, *The Undermining Influence of the Federal Death Penalty on Capital Policymaking and Criminal Justice Administration in the States*, 100 J. Crim. L. & Criminology 149, 211 (2010); John P. Cunningham, *An Uninvited Guest: The Federal Death Penalty and the Massachusetts Prosecution of Nurse Kristen Gilbert*, 41 U. Rich. L. Rev. 969, 988 (2007). The notion that the States would lose control over that sovereign prerogative whenever a chemical agent — no matter how common — is used in a crime resulting in death surely implicates state interests of the highest order.

At the same time, the national interest is much weaker. The government has not argued (and cannot argue) that failing to prosecute Bond under federal law would put the United States in violation of its treaty obligations. It is doubtful that Bond's conduct implicates the concerns of the Convention in the slightest and in all events the fact that Pennsylvania prohibits the conduct would fully satisfy any treaty obligations. The Supreme Court recently vindicated the structural limitations that govern the division of power among the branches of the federal government, even though doing so placed the Nation in an acknowledged and irrevocable breach of our treaty obligations. *See Medellin v. Texas*, 552 U.S. 491, 515-16 (2008). There is certainly no reason not to vindicate the structural division

between the state and national government when doing so does not remotely implicate the breach of any treaty obligation.  Moreover, unlike the problem of protecting migratory birds that travel from country to country, there is no reason to think the States cannot effectively police local domestic assaults that involve chemicals and occur solely within their borders with no interstate connection.  *See* 18 Pa.C.S.A. § 2701 (simple assault); 18 Pa.C.S.A. § 2702 (aggravated assault); 18 Pa.C.S.A. § 2709 (harassment).  Especially in the absence of any congressional effort to focus on uniquely interstate aspects of the problem, the malicious use of widely available chemicals in domestic disputes — unlike the actual core of the Chemical Weapons Convention or migratory birds that are defined by their tendency to move between jurisdictions — does not demand a national solution or implicate a paramount national concern.

Contrary to the government's assertions, this case is also readily distinguished from *Holland* because the government's view of 18 U.S.C. § 229 extends far beyond what the Convention requires.  *Cf.* U.S. Br. 22 (arguing that the statutory provisions "virtually mirror" the Convention).  This truth is reflected both in the details of the statute, and in its sweeping breadth as interpreted by the government.  As to the details, the Convention prohibits signatory states and persons within their territory from using chemical weapons, or undertaking "[t]o develop, produce, otherwise acquire, stockpile or retain chemical weapons, or

transfer, directly or indirectly, chemical weapons to anyone." App. 70. The statute, in contrast, sweeps more broadly. It not only makes it unlawful for any person to use, develop, produce, otherwise acquire, stockpile, retain, or transfer chemical weapons, but also renders it unlawful for any person to "receive, . . . own, possess, . . . or threaten to use" any chemical weapon. 18 U.S.C. § 229(a)(1).

This added language goes to the heart of the federalism problems with the statute, at least if the other provisions of the statute sweep as broadly as the government imagines. Federal possessory crimes are rare, and generally implicate either a broader federal regulatory regime or an indisputable national interest. *See*, *e.g.*, *United States v. Bass*, 404 U.S. 336, 347-49 (1971) (interpreting federal crime of gun possession to require specific nexus to interstate commerce so as to avoid problems of mere possession without a federal interest); *see also id*. at 339; 16 U.S.C. § 668(a) (bald and golden eagles); 18 U.S.C. § 175(a) (biological weapons); 18 U.S.C. § 831 (nuclear material); 18 U.S.C. § 842(n)(1) (certain plastic explosives); 18 U.S.C. § 2252(a)(4)(B) (child pornography produced with materials shipped in interstate commerce). If "chemical weapons" extend only to actual chemical weapons, Section 229 might conform to these other examples. If it extends to countless household chemicals whenever they are possessed with a malicious intent, then this aspect of the statute creates substantial constitutional concerns and has no analog in the U.S. Code.

But the disconnect between the statute as interpreted by the government and the requirements of the Convention extend well beyond the details. Nothing in the Convention specifies that it must be the federal government, as opposed to the States, that criminalizes conduct that implicates the Convention. The Convention is not self-executing; it expressly envisions that legislation in the signatory states will be necessary to bring signatories into compliance with the Convention's provisions. *See* App. 71 (Convention Art. VII); *see also Medellin*, 552 U.S. at 505 ("while treaties may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms") (quoting *Igartua–De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc) (Boudin, C. J.) (internal quotation marks omitted). Nothing in the Convention requires the United States to ignore its constitutional structure. To the contrary, the Convention expressly requires each signatory state, "*in accordance with its constitutional processes*," to adopt the "necessary measures to implement" its treaty obligations. App. 71 (Convention Art. VII) (emphasis added). The Convention does not dictate *how* each signatory state must implement its obligations or require the United States to adopt comprehensive federal legislation. Instead, it is a well-settled background principle that a "federal state may leave implementation" of a treaty "to its constituent units," and the Convention expressly

31

accommodates that possibility.  Restatement (Third) Foreign Relations Law § 321 cmt. b.

Whatever the scope of Congress's authority to implement a valid treaty, it can hardly be doubted that the Necessary and Proper Clause does not allow Congress unbounded authority to impose requirements that go beyond, and are not required by, the relevant treaty.[3]  Nothing in *Holland* even purported to address such a situation.  At a minimum, if Congress decides to go further than what a treaty requires, it must rely on a valid source of legislative power.  In these circumstances, striking down legislation as in excess of the Necessary and Proper Clause does not call into question the validity of either *Holland* or the non-self-executing treaty itself; instead, it merely recognizes that, no matter what the limits of Congress's treaty power, it cannot extend beyond the treaty itself.

**C.    The Court Should Interpret 18 U.S.C. § 229 Consistent With Federalism Principles And To Avoid Grave Constitutional Concerns.**

Fortunately, there is no need for this Court to definitively resolve the difficult questions concerning the scope of *Missouri v. Holland* or whether it could

---

[3] As a matter of grammatical construction, the Necessary and Proper Clause authorizes Congress only to make laws necessary and proper for the President "to make Treaties" (such as appropriating money for diplomats to travel to negotiate a treaty), not to make laws necessary and proper to implement non-self-executing treaties already made.  *See Rosenkranz*, 118 Harv. L. Rev. at 1882–84.  As Justice Story emphasized, "the power is nowhere in positive terms conferred upon congress to make laws to carry stipulations of treaties into effect."  *Prigg v. Pennsylvania*, 41 U.S. (16 Pet.) 539, 618–22 (1842).

be extended as far as the government seeks, because there is an available interpretation of 18 U.S.C. § 229 that avoids these difficulties and respects our system of federalism. When the statute is properly construed, applying traditional tools of statutory construction, it is clear that Congress did not intend to federalize every malicious use of chemicals. The Court can avoid the constitutional concerns discussed above by reasonably interpreting the statute as not extending to Bond's conduct, but rather confining it to actions that fall within the Convention's core concerns.

### 1.    Multiple Canons of Construction Counsel Against the Government's Sweeping View of 18 U.S.C. § 229.

Four cardinal principles of statutory interpretation, rooted in fundamental precepts of federalism and constitutionally limited government, should inform the Court's interpretation of 18 U.S.C. § 229.

*First*, courts should not "decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. United States*, 196 U.S. 283, 295 (1905). That means that statutes should be construed to avoid serious constitutional problems "unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 78 (1997). If a case "can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory

33

construction," the Court should decide only the statutory question and interpret the statute away from constitutional doubt. *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *see also United States v. Whitted*, 541 F.3d 480, 492 & n.1 (3d Cir. 2008) (citing cases).

**Second**, this basic principle of constitutional avoidance is backed by rules specific to preserving the federalism balance. The "plain statement rule" of *Gregory v. Ashcroft* establishes that Congress must speak in unmistakably clear terms when it wishes to displace traditional state regulation. 501 U.S. at 460–61; *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Congress is presumed not to extend federal regulation to areas that have traditionally fallen under the States' police powers through "muffled hints" or "obscure grant[s] of authority." *Gonzales v. Oregon*, 546 U.S. 243, 274–75 (2006); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Indeed, when Congress's intent to displace historical state practice "is doubtful, our federal system demands deference to long-established traditions of state regulation." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 546 (1994).

These rules apply with special force in the context of criminal law. As the Supreme Court has emphasized, courts should "not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction." *Bass*, 404 U.S. at 349; *see also Lopez*, 514

U.S. at 561 n.3 (quoting *United States v. Enmons*, 410 U.S. 396, 411–12 (1973) ("When Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.'").  Instead, statutes should be interpreted to avoid rendering "traditionally local criminal conduct" "a matter for federal enforcement."  *Jones*, 529 U.S. at 858 (quotations omitted).  Unless "Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance" in the prosecution of crimes.  *Id.* (quoting *Bass*, 404 U.S. at 349); *see also Rewis v. United States*, 401 U.S. 808, 812 (1971).

*Third*, because statutes should be interpreted consistent with their "overall object and policy," courts should avoid interpretations that are "inconsistent with common sense," *Office Comm'r. Baseball v. Markell*, 579 F.3d 293, 304 (3d Cir. 2009), or that "would operate unjustly, or lead to absurd results."  *Heydenfeldt v. Daney Gold & Silver Mining Co.*, 93 U.S. 634, 638 (1877); *see also McNeill v. United States*, 131 S. Ct. 2218, 2223 (2011).  Neither fairness nor logic is served by "read[ing] a statute to produce absurd or unintended results 'demonstrably at odds with the intentions of its drafters.'"  *United States v. Hodge*, 321 F.3d 429, 437 (3d Cir. 2003) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).  Courts accordingly have "some 'scope for adopting a restricted rather than a literal or usual meaning of [a statute's] words where acceptance of that

meaning would lead to absurd results." *Comm'r v. Brown*, 380 U.S. 563, 571 (1965) (internal quotations omitted); *see also In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006) (avoiding absurd results is a "basic tenet" of statutory construction).

**Fourth**, the rule of lenity requires that any ambiguities in a criminal statute be interpreted in the defendant's favor. *Skilling v. United States*, 130 S. Ct. 2896, 2933 (2010); *Gov't of Virgin Is. v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993); *see also Fowler v. United States*, 131 S. Ct. 2045, 2055 (2011) (Scalia, J., concurring). This rule "is rooted in fundamental principles of due process." *Dunn v. United States*, 442 U.S. 100, 112 (1979); *see also United States v. Lanier,* 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."). When a "choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate," before a court chooses "the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Jones*, 529 U.S. at 858 (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22 (1952)); *see also Skilling*, 130 S. Ct. at 2933 ("less constrained" construction should be rejected absent "Congress' clear instruction otherwise"); *Bass*, 404 U.S. at 347–48 (discussing policies underlying rule of lenity).

These bedrock principles reinforce each other here.  Interpreting Section 229 as applying to any malicious use of chemicals, including the use of common household chemicals in purely local domestic disputes, would dramatically reset the state-federal balance by federalizing a quintessentially traditional area of state criminal law.  *See Jones*, 529 U.S. at 858; *see also United States v. Rodia*, 194 F.3d 465, 479 (3d Cir. 1999) ("criminal context" is an "area . . .  traditionally . . . regulated by the states").  The government's interpretation would also mean that any malicious use of chemicals resulting in death would make a defendant death penalty eligible as a matter of federal law, despite the States' general prerogative to dictate whether to employ the death penalty for all but a narrow range of crimes with an obvious federal nexus.  *See Moore*, 716 F.2d at 1517.  As a matter of law, as well as common sense, Congress could not have intended to take that revolutionary step without speaking in the clearest and most unmistakable terms. It is therefore dispositive for purposes of this case that the government cannot identify any statutory provision establishing that Congress had any intent, much less a clear and specific intent, to treat citizens involved in domestic disputes the same as dangerous terrorists using weapons of mass destruction, just because the statute employs an inclusively defined "toxic chemical."  The notion that Congress intended to criminalize domestic disputes to satisfy the United States' treaty

obligations under an international arms-control agreement is as implausible as it sounds.

**2.    18 U.S.C. § 229 Can Be Construed To Avoid Constitutional Doubt and To Respect The Traditional Federal-State Balance.**

The government's overly expansive interpretation of Section 229 is not the only, or even the best, interpretation of the statute.  By interpreting the statute to reach any malicious use of toxic chemicals, the government gives the statute a reach that is wholly unnecessary to a proper implementation of the Convention and would fundamentally upset the traditional federal-state balance.  By interpreting the statute instead to reach only the kind of acts that would violate the Convention if undertaken by a signatory state, the Convention is fully implemented, the traditional federal-state balance preserved, and all the difficult constitutional questions avoided.

The primary problem with the government's construction of Section 229 is that it deems countless household substances as "chemical weapons" when they are used for malicious purposes.  *See* Bond Br. 28, 31 (describing other absurd consequences of the government's construction).  That cannot be right.  The statute defines "chemical weapon[s]" presumptively to include "toxic chemicals," "except where intended for a purpose not prohibited under this chapter."  18 U.S.C. § 229F(1)(A).  "Toxic chemical[s]" are in turn defined broadly to include "any

chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals." *Id*. § 229F(8)(A). That definition would seem to include a vast array of widely available substances. As Justice Alito memorably remarked at the oral argument, under the government's interpretation, the use of vinegar to kill a former friend's goldfish would appear to violate the statute's prohibition on the use of chemical weapons. Tr. of Oral Argument at 29:15–31:20, *Bond v. United States*, 131 S. Ct. 2355 (2011) (No. 09-1227), *available at* http://www.supremecourt.gov/oral_ arguments/argument_transcripts/09-1227.pdf. The key then to giving the statute a manageable scope is that "toxic chemicals" are only presumptively included within the definition of "chemical weapons." They do not qualify "where intended for a purpose not prohibited under this chapter." 18 U.S.C. § 229F(1)(A). The statute goes on to clarify that the statute does not reach toxic chemicals intended for "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity." *Id.* § 229F(7)(A). Although this language seems to cure the statute of much of its potentially problematic breadth, the government robs this language of its curative effect by deeming any malicious use of a chemical to fall outside this provision. That cannot be correct.

The meaning of statutory language is "determined by reference to the language itself, the specific context in which the language is used, and the broader

context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). In this regard, it is worth emphasizing that the whole point of Section 229 is to implement the Chemical Weapons Convention's direction to signatory states to prohibit conduct by private parties that would violate the Convention if undertaken by signatory states. *See Heydenfeldt*, 93 U.S. at 638 (statutory interpretation turns on "the causes which induced its enactment"). In particular, the Convention requires each signatory state to "adopt the necessary measures" to "[p]rohibit natural and legal persons anywhere on its territory . . . from undertaking any activity prohibited to a State Party under this Convention." App. 71 (Convention Art. VIII). In light of this overarching purpose, interpreting the statute to reach conduct that no signatory state could possibly engage in — such as using chemicals in an effort to poison a romantic rival or kill a neighbor's goldfish — is unnecessary and unintended.

Numerous provisions of the statute reinforce the notion that it intends to reach serious conduct that would violate the Convention if undertaken by a signatory state. The statute exempts conduct that a government undertakes, so that the "chemical weapons" covered by the statute do not include chemicals used for "peaceful," "protective," "unrelated military," or "law enforcement" purposes. 18 U.S.C. § 229F(7). The statute clearly reaches conduct by non-state actors, like terrorist groups, that are capable of misusing chemical weapons in ways analogous

40

to signatory states. To that end, Congress drafted the statute to focus on terrorism and imposed substantial penalties and unusual restrictions consistent with the concerns that apply to terrorists, including prohibiting release pending appeal. *See* 18 U.S.C. § 2332b(g)(5)(B)(i) (describing violation of Section 229 as a "federal crime of terrorism"); *see also id*. § 3143(b)(2); *id*. § 3142(f)(1)(A); *id*. § 2332b(g)(5)(B)(i). Those penalties are perfectly appropriate in dealing with war-like actions that could be undertaken by a signatory state or terrorist group; they are wholly out of place in addressing a garden variety malicious use of a widely available chemical.

As noted, because of the statutory structure and the broad definition of "toxic chemical," the statutory exceptions for uses "not prohibited by this chapter" do the heavy work in limiting the statute to an appropriate scope. The exception for "peaceful purposes," which is most relevant here, is defined to include "[a]ny peaceful purpose related to an industrial, agriculture, research, medical, or pharmaceutical activity or other activity." *Id*. § 229F(7)(A). The government interprets this exception narrowly in a way that equates any malicious use of a chemical with a non-peaceful use. *See* U.S. Br. 35–36 (using "dangerous chemicals to poison another human being is not a 'peaceful' . . . purpose"). But that is neither a required nor a sensible interpretation. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (statutory language should not be interpreted to

"outer limits" of its "definitional possibilities"). "Peaceful" has many possible definitions in the abstract. But in its most traditional sense, and the one most relevant in the context of agreements between nation-states, the term means non-warlike (*i.e.,* "freedom from war or hostilities"). Shorter Oxford English Dictionary, at 2128–29 (5th ed. 2002) (defining "peaceful" and "peace"); The American Heritage College Dictionary, at 1005 (3d ed. 1997) (same). It can also have the broader meaning of "freedom from civil disorder," especially "as maintained by law." Shorter Oxford English Dictionary at 2128. And it can have an even broader meaning of "freedom from mental, spiritual, or emotional disturbance." *Id*.; *see also* The American Heritage College Dictionary, at 1005 ("Inner contentment; serenity").

Only the first of these definitions — non-warlike — gives the statutory exemption a reasonable scope that avoids potentially unconstitutional, unintended, and absurd applications. Reading "peaceful purposes" to mean non-warlike behavior is consistent with the Convention's focus on "disarmament" and "weapons of mass destruction," App. 69, and on prohibiting private actions that would be unlawful if undertaken by a signatory state. Nation-states engage in peaceful and warlike acts; they do not poison romantic rivals. The concern with signatory states is that they will use chemical weapons against the military forces or civilians of another state or perhaps on their own population. The concern with

terrorist groups is that they will use chemical weapons on the civilian population to wreak general havoc and terror.  But neither a nation-state nor a terrorist group attempts to retaliate against a romantic rival or becomes exasperated with a neighbor's pet.  Those actions may be malicious, but they are not war-like and are not sensibly covered by the statute.

Interpreting the exemption for peaceful uses broadly also makes sense of the statute's lack of any provisions requiring a jurisdictional element or other more direct federal nexus as an element of the offense.  *See Bond*, 581 F.3d at 134 (noting the absence of such provisions); *see also United States v. McRary*, 665 F.2d 674, 678-79 (5th Cir. 1982) (when a "federally created crime involves an area traditionally left to the domain of the states, the jurisdictional authority of the United States becomes a crucial part of the proof").  As long as the statute requires warlike conduct and not mere malicious intent, it covers the kind of serious misconduct that implicates a uniquely federal interest.  *See Stewart v. Kahn*, 78 U.S. (11 Wall.) 493, 506–07 (1871); *see also* App. 77–78 (listing other federal criminal statutes addressing assaultive/threatening behavior, all of which require proof of a federal interest as a statutory element of the offense).

Moreover, interpreting "peaceful purposes" to refer to non-warlike conduct is consistent with the Convention's other requirements.  The Convention not only seeks to prohibit the stockpiling, retention, and use of chemical weapons, but it

43

also requires "their *destruction*." App. 69 (Preamble) (emphasis added); *see also* App. 70 (Convention Art. I) (each signatory state "undertakes to destroy chemical weapons . . . in any place under its jurisdiction or control"). The Convention includes specific provisions requiring signatory states to submit annual declarations concerning "any chemical weapons located in any place under its jurisdiction or control" and to provide a "general plan" for their destruction. Convention Art. III, *supra*. Likewise, the Convention includes a "coercive verification system" that contemplates "inspections" by an international organization "in response to an allegation that chemical weapons have been used." App. 74; *see also see also* App. 79–80 (Statement by Attorney General J. Reno) (purpose is to "investigate and prosecute chemical weapons-related activities and improve chances of detecting terrorists before they strike").

These provisions make little sense if the "peaceful purposes" exemption is construed narrowly, so as to make any common household chemical a "chemical weapon" whenever it is combined with a malicious intent. Congress could not have intended to impose a broad obligation on the United States to hunt out and "destroy" any chemical that might be used for malicious purposes. It could not have intended to impose commensurate reporting obligations on the United States. Nor could it have plausibly intended to invite international inspections any time

44

one of its citizens might use a chemical in a domestic dispute or for some other violent purpose.

The more sensible construction is parallel to the construction of the federal arson statute, 18 U.S.C. § 844(i), adopted by the Supreme Court in *Jones v. United States*. That statute made it a federal crime to damage "by means of fire or an explosive, any . . . property used in interstate or foreign commerce," and, in *Jones*, the Court decided whether that statute applied to the arson of a building in Indiana that was not used for any commercial venture but only as a private residence. 529 U.S. at 850. The statute was broadly written to cover "any building" and, as the Court recognized, excluded "no particular type of building." *Id*. at 855. Moreover, the government argued that the building had been used in activities affecting commerce, because it had received natural gas from sources outside of Indiana, served as collateral for an out-of-state mortgage, and was used to obtain an insurance policy from an out-of-state insurer. *Id*.

In an opinion authored by Justice Ginsburg, the Court rejected the government's position. As the Court explained, the government's interpretation would bring "[p]ractically every building in our cities, towns, and rural areas" within the "federal statute's domain." *Id*. at 857. The Court refused to read the statute to "render the 'traditionally local criminal conduct' in which" the defendant had engaged "a matter of federal enforcement." *Id*. at 858 (quoting *Bass*, 404 U.S.

at 350). Instead, to avoid serious constitutional concerns, the Court applied a limiting construction, concluding that the statute was "not soundly read to make virtually every arson in the country a federal offense." *Id*. at 859 (concluding that Congress did not clearly intend to remove "this genre" of arson from state law enforcement authorities); *see also Williams v. United States*, 458 U.S 279, 289-90 (1982) (refusing to treat passing of bad checks as "false statements" under 18 U.S.C. § 1014 because statute was not unambiguous, there was no evidence Congress intended such a broad scope, and the subject matter was traditionally regulated by the States).

The same analysis should apply here. As Ms. Bond explained in her earlier submissions, the statute risks turning cleaning supply aisles at the local grocery story into potential stockpiles of "chemical weapons." Bond Br. 31. The statute is not soundly read to make virtually every assault involving chemicals in the country a federal offense or to make every poisoning case eligible for the federal death penalty. To the contrary, a proper interpretation of Section 229 confirms that Congress only intended to address warlike, terrorist activities involving chemical weapons in the ordinary and common sense understanding of the term.

## II. If 18 U.S.C. § 229 Cannot Be Construed Away From Constitutional Doubt, It Is Unconstitutional Because It Is Not Necessary And Proper To Carry Out The Executive's Treaty Power.

If this Court construes Section 229 as reaching Bond's conduct, it will have little choice but to find the statute unconstitutional as applied. The government defends the statute as being a valid exercise of Congress's Necessary and Proper Clause authority to implement treaties and cites *Holland* as supporting that argument. *See* U.S. Br. 25-32. But as already demonstrated, *Holland* is distinguishable and this Court should decline the invitation to be the first court to extend *Holland* as far as the government urges.

Nothing in *Holland* or any other case suggests that the federal government can grant itself plenary power by ratifying a treaty and then enacting implementing legislation that intrudes on areas traditionally left to the States. The only plausible basis for a statute that intrudes as deeply on the traditional state prerogative to punish assaults and determine which domestic crimes resulting in death merit the death penalty would be the Necessary and Proper Clause. But there are three basic reasons that the Necessary and Proper Clause cannot sustain the application of Section 229 to Bond's conduct.

*First*, Section 229 is neither necessary nor proper legislation because it goes beyond what is necessary to implement the treaty. *See Printz*, 521 U.S. at 923–24; *see also McCulloch*, 17 U.S. at 415 (must be "appropriate" link between power

conferred by Constitution and law enacted by Congress). The criminal provisions that formed the basis for Bond's indictment make it unlawful for any person "knowingly" to "develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon." 18 U.S.C. § 229(a)(1). While those provisions largely track the language of the Convention, they go further in some critical respects. For example, the statute prohibits possessing or threatening to use chemical weapons, *see id.*, while the Convention does not. *See* App. 70. The extension of the statute to possession exacerbates the statute's intrusion on the federal-state balance, yet that provision is utterly unnecessary to implement the Convention. *See* Section I.B.2., *supra.* Moreover, the prohibition on possession was included in the indictment to which Bond objected on constitutional grounds. *See* App. 7–8 (indictment). The statute is thus unconstitutional as applied to Bond.

*Second*, the statute is unnecessary and improper in a more profound sense. For the reasons set forth in Section I.C., *supra*, the extension of the criminal prohibitions to uses of chemicals that are malicious but not warlike and lack any analog for signatory states is wholly unnecessary to implement the Convention. To that end, applications of the statute in those circumstances, even if (contrary to Bond's contentions) compelled by the statutory text, would be unconstitutional. *See United States v. Comstock*, 130 S. Ct. 1949 (2010) (statute "necessary and

proper" when it is "reasonably adapted" to a legitimate ends, and properly accounts for state interests).  Moreover, even on the assumption that it is necessary for the United States to prohibit every malicious use of chemicals to comply with our treaty obligations, it is wholly unnecessary for the federal government to do so.

It can scarcely be doubted that the federal government does not have a monopoly on governmental efforts to comply with treaty obligations.  Any doubt on that score was removed by *Medellin*.  *See* 552 U.S. at 522–23.  *Medellin* underscores the reality that because the vast majority of arrests in this country are made by state and local officials — and not by federal agents — the primary responsibility for complying with the United States' treaty obligations to provide consular notification under the Vienna Convention fall in the first instance on state and local authorities.  *Medellin* demonstrates dramatically that state authorities can sometimes fail to act in compliance with a treaty and can bring the entire country into default of its treaty obligations.  But in the vast majority of situations, state and local officials faithfully implement the United States' treaty obligation to provide consular notification.  More to the point, no one in Congress thought it was necessary to federalize the Nation's police forces just because the Vienna Convention created an obligation that would fall on police forces throughout the Nation.  In the same way, if the Chemical Weapons Convention really does require every malicious use of a chemical to be criminalized, there is no reason why

existing state laws punishing everything from assault to murder would not be sufficient to bring the United States into compliance.

Federalizing that broad swath of criminal law is no more necessary to comply with the Chemical Weapons Convention than federalizing the Nation's entire police force would be necessary to comply with the Vienna Convention. If Congress had tried the latter, there is little doubt that its action would be deemed an unconstitutional usurpation of the traditional responsibilities of state and local governments. If Congress really meant to do the former in this statute (and we strongly doubt that to be the case), then it is just as obviously unconstitutional.

*Third*, and finally, the application of the statute to Bond would be unconstitutional, because even if it were necessary for the federal government to criminalize ordinary assaults involving chemicals to come into compliance with the Convention, the statute's application to Bond would simply lie beyond Congress's constitutional authority. The application of this statute to Bond lays several steps beyond *Holland. See* Section I.B.2., *supra*. The State's interest here is far more fundamental than a pecuniary interest in migratory birds that would not be around to migrate absent international cooperation. The State's effort to prosecute domestic crime and decide when to impose the death penalty is at the heart of the State's reserved police power. *See Montana v. Egelhoff*, 518 U.S. 37, 43 (1996); *see* pp. 26-28, *supra*.

To be sure, federal criminalization, and indeed over-criminalization, have both become common. *See* Section III, *infra*. But federal criminal statutes routinely feature jurisdictional requirements or other elements that demonstrate a uniquely federal interest. *Cf. Bond*, 581 F.3d at 134 (recognizing that Section 229 does not contain a "requisite federal interest element"). Those elements are critical to the statutes' constitutionality. Congress could not pass a murder statute making every murder everywhere in the nation punishable by federal law and with a federal death penalty. Senate ratification of an international convention on respect for human life would not change the constitutional analysis and give Congress a power it otherwise lacked. The same is true with respect to assaults and murders that happen to involve chemicals. The ratification of the Chemical Weapons Convention does not allow the presence of ubiquitous chemicals to substitute for the missing federal element. The statute certainly need not be read to extend that far, but if it is to be read in the manner the government urges, it is unconstitutional as applied to Bond.

## III. There Are Strong Policy Reasons Not To Accept The Government's Expansive And Novel Theory.

Strong policy reasons counsel against adopting the government's expansive theory. Federalism is not an anachronism. It continues to serve important objectives "first by protecting the integrity of the governments themselves, and second by protecting the people, from whom all governmental powers are

derived." *Bond*, 131 S. Ct. at 2364.    Federalizing every purely local criminal activity corrodes respect for dual sovereignty, leaves the public uncertain of the scope of criminal law, and taxes an overburdened federal judiciary.

There is a persistent concern, voiced in a variety of contexts, that the federal government is unnecessarily federalizing local and traditional state crimes.  *See*, *e.g.*, Matthew H. Blumenstein, Note, *RICO Overreach: How The Federal Government's Escalating Offensive Against Gangs Has Run Afoul Of The Constitution*, 62 Vand. L. Rev. 211, 217 (2009); Edwin Meese, III, *Big Brother on the Beat: The Expanding Federalization of Crime*, 1 Tex. Rev. L. & Pol. 1, 3 (1997); John Panneton, *Federalizing Fires: The Evolving Federal Response to Arson Related Crimes*, 23 Am. Crim. L. Rev. 151 (1985).  The growth of federal power in the area of criminal law creates unnecessary strains on the federal justice system while sapping the ability of States to "exercise discretion in a way that is responsive to local concerns."   Kathleen F. Brickey, *Criminal Mischief: The Federalization of American Criminal Law*, 46 Hastings L.J. 1135, 1173 (1995). Federal criminal statutes can also create "dramatically disparate treatment of similarly situated offenders, depending on whether they are prosecuted in federal or state court."   Steven D. Clymer, *Unequal Justice: The Federalization of Criminal Law*, 70 S. Cal. L. Rev. 643, 646 (1997).

Moreover, the government's interpretation trivializes the concept of chemical weapons. The Chemical Weapons Convention was a major step toward the eradication of truly frightening weapons of mass destruction. Although many nation-states have agreed to lay such weapons aside, terrorist groups and other stateless organizations are far less amenable to civilized agreement. The government should be pursuing those groups. If this prosecution succeeds, other treaty signatories would rightfully question why the United States treats this activity as chemical warfare and has committed scarce resources to prosecute local domestic disturbances.

At the same time, interpreting the statute broadly risks having unnecessary spillover effects that could lead to intrusions into the United States' sovereignty. Interpreting Section 229 broadly here will inevitably risk having the treaty interpreted broadly elsewhere. Indeed, if every improper and violent use of a chemical, regardless of whether it involves warlike conduct, counts as use of a "chemical weapon," the treaty contemplates that the those uses will be subject to investigation and inspection by an international organization. *See* Convention Verification Annex Part XI, *supra*.

Finally, an overbroad construction of this statute invites misconduct and improper prosecutions. Section 229 declares that violators have committed a "Federal crime of terrorism." 18 U.S.C. § 2332b(g)(5). If Bond's conviction

stands, federal prosecutors will have perverse incentives to pursue similar local crimes in an effort to secure easy "terrorism" convictions. That would destroy "the integrity, dignity, and residual sovereignty of the States," *Bond*, 131 S. Ct. 2364, with no corresponding furtherance of the purpose of Section 229 or the treaty it is supposed to implement.

## CONCLUSION

For these reasons, the Court should vacate the judgment and sentence.

Respectfully submitted,

 /s/ Paul D. Clement

Ashley C. Parrish
Adam M. Conrad
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC  20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
aparrish@kslaw.com
aconrad@kslaw.com

Paul D. Clement
*Counsel of Record*
Conor B. Dugan
BANCROFT PLLC
1919 M Street, NW, Suite 470
Washington, DC  20036
Telephone: (202) 234-0090
Facsimile: (202) 234-2806
pclement@bancroftpllc.com
cdugan@bancroftpllc.com

Robert E. Goldman
ROBERT E. GOLDMAN LLC
P. O. Box 239
Fountainville, PA 18923
Telephone: (215) 348-2605
Facsimile: (215) 348-8046
reg@bobgoldmanlaw.com

*Counsel for Defendant-Appellant*

DATED: September 16, 2011

## CERTIFICATIONS OF LENGTH, FORMAT, AND ADMISSION

1.      Per the Microsoft Word "word count" function, excluding tables, certifications, and addenda, the foregoing contains 12,093 words, and therefore complies with the limitation on length of a brief stated in Fed. R. App. P. 32(a)(7)(B);

2.      The text of this electronic brief and the hard copy filed on September 16, 2011 are identical;

3.      A scan and PDF conversion using Symantec software demonstrated that the PDF file is a virus-free form; and

4.      The below counsel are admitted to practice before this Court.

/s/ Paul D. Clement
Paul D. Clement
BANCROFT PLLC
1919 M Street, NW, Suite 470
Washington, DC  20036
Telephone: (202) 234-0090
Facsimile: (202) 234-2806
pclement@bancroftpllc.com
cdugan@bancroftpllc.com

**CERTIFICATE OF SERVICE**

I certify that on this date I filed a copy of the foregoing using the Court's

ECF system, which will cause notice of the filing and a copy to be issued to the

following:

Paul G. Shapiro
United States Attorney's Office
for the Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106

I further certify that a .pdf file of the foregoing brief was emailed to the

above counsel at paul.shapiro@usdoj.gov on September 16, 2011.

This 16th day of September, 2011.          /s/    Paul D. Clement